UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
SEATTLE DIVISION

| | |
|---|---|
| PETER FOGEL, Derivatively on Behalf of ZILLOW GROUP, INC., <br><br> Plaintiff, <br><br> v. <br><br> LLOYD D. FRINK, RICHARD N. BARTON, JEREMY WACKSMAN, JEREMY HOFMANN, ERIK BLACHFORD, GREGORY B. MAFFEI, GORDON STEPHENSON, JAY C. HOAG, APRIL UNDERWOOD, AMY C. BOHUTINSKY, CLAIRE CORMIER THIELKE, and J. WILLIAM GURLEY, <br><br> Defendants, <br><br> -and- <br><br> ZILLOW GROUP, INC., a Washington Corporation, <br><br> Nominal Defendant. | Case No. <br><br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND UNJUST ENRICHMENT <br><br> [REDACTED] |

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

Plaintiff, Peter Fogel, by his attorneys, submit this Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty and Unjust Enrichment against defendants herein on behalf of Zillow Group, Inc ("Zillow" or the "Company").  Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which is based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of the Company's internal books and records produced in response to plaintiff's inspection demand made pursuant to Washington Business Corporation Act, Revised Code of Washington section 23B.16.020, public filings with the U.S. Securities and Exchange Commission ("SEC"), and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought by plaintiff on behalf of nominal defendant Zillow against certain of its former and current officers and directors for breaches of fiduciary duty and unjust enrichment.  As a result of the Individual Defendants' (defined below) actions and omissions, Zillow suffered substantial harm, including reputational damage, exposure to significant securities litigation liability, and massive destruction of shareholder value.

2.      Zillow operates a platform acting as a real estate marketplace and information hub for buying, selling, renting, and financing homes.  It provides services like home listings with virtual tours, a "Zestimate" tool for property valuation, and tools for landlords and renters to manage leases and payments.  The platform also connects users with real estate agents, mortgage lenders, and other professionals.

3.      Redfin Corporation ("Redfin") is a technology-powered real estate brokerage that provides services for buying, selling, and renting homes.[1]  It operates an online platform and mobile app, and offers brokerage services, mortgage loans, and title and settlement services, all with the goal of making the real estate process more efficient and cost-effective for customers.  Redfin integrates

---

[1] In July 2025, the Rocket Companies, Inc. acquired Redfin.  Redfin is now a wholly-owned subsidiary of Rocket.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 1 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

technology, such as map-based search and machine learning, with the services of local agents who are paid a salary plus bonuses instead of traditional commissions.

4. In 2021, Redfin acquired for $608 million. RentPath operated leading rental sites, including ApartmentGuide.com, Rent.com, and Rentals.com. With the acquisition of RentPath, Redfin became a major competitor to Zillow in the advertising on internet listing services ("ILS") market for rentals, including listings for multifamily rental properties (buildings with more than twenty-five units). On February 6, 2025, Zillow and Redfin executed two agreements (a "Partnership Agreement" and a "Content License Agreement", collectively the "Agreements") that together removed Redfin as an independent competitor in the multifamily rental ILS advertising market.

5. Under the Partnership Agreement, Zillow paid $100 million and in return Redfin agreed to terminate all of its multifamily advertising contracts and shut down that line of business rather than continue competing head-to-head. In parallel, the Content License Agreement obligated Redfin to stay out of the multifamily ILS advertising market for up to nine years and to carry only listings that are also displayed on Zillow's sites, functionally ending Redfin's independent offering in this segment. The Content License Agreement makes Zillow the exclusive provider of multifamily listings across Redfin's rentals network, and Redfin agreed not to display any third-party multifamily listings or to compete for multifamily advertising customers of its own during the term, which cements Zillow's control over the inventory that appears on Redfin's sites. The compensation structure for this syndication includes a per-lead payment from Zillow to Redfin, subject to a first-year minimum of $75 million, aligning Redfin's economics with Zillow's funnel rather than with an independent ad-sales business of its own.

6. Zillow and Redfin are two of the top three firms by revenue in the rental ILS industry. The effect of the Agreements is to consolidate the rental ILS industry even further. Zillow and Redfin's agreements are blatant violations of antitrust laws, including section 1 of the Sherman Act and section 7 of the Clayton Act.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 2 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

7. [REDACTED] [2]

8. As expected, state and federal government antitrust agencies soon sued Zillow over the Agreements, including the Federal Trade Commission ("FTC") in the United States District Court for the Eastern District of Virginia (the "FTC Action"). On May 6, 2026, the court denied the motion to dismiss the FTC Action, holdings that the FTC alleges "what appears from the face of the Complaint to be clearly anti-competitive conduct[.]" The court also explained that the "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question have an anticompetitive effect on customers and markets[.]" These investigations and litigations have caused Zillow significant harm in terms of materially increased legal expenses, before even taking into account eventual settlements or judgments.

9. These increased legal expenses also show that Zillow's statements concerning its regulatory exposure were false and misleading. When defendants disclosed the truth, however, about the "headwinds" caused by the regulatory exposure to the Company's financial results and the antitrust litigation against it proceeded, Zillow's stock price declined materially. In particular, from a high of almost $87 per share, the Company's Class A stock price fell to just $32.22, a drop of $54.54 per share. During the same time period, the Company's Class C stock price fell from a high of over $90 per share to approximately $32.03 a share. In total, the Company's market capitalization fell almost $14 billion.

10. While Zillow and its investors have fared poorly from entering into the Agreements, the same cannot be said for certain of the defendants. In particular, the Insider Selling Defendants

---

[2] [REDACTED] All references to "ZG-Books_Records___" are to the documents produced by Zillow in response to plaintiff's inspection demand.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

- 3 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

(defined below) sold almost $74 million worth of their personally held stock near Zillow's stock price highs.

11.     Further, as a direct result of this unlawful course of conduct, Zillow is now the subject of a federal securities class action lawsuit filed in the United States District Court for the Western District of Washington on behalf of investors who purchased Zillow's shares, captioned *Breidert v. Zillow Group, Inc., et al.*, Case No. 2:26-cv-02016 (W.D. Wash.) (the "Securities Class Action").

## JURISDICTION AND VENUE

12.     Jurisdiction is conferred by 28 U.S.C. §1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

14.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Zillow is incorporated in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Zillow, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 4 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

## THE PARTIES

**Plaintiff**

16. Plaintiff Peter Fogel was a shareholder of Zillow at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Zillow shareholder. Plaintiff is a citizen of Florida.

**Nominal Defendant**

17. Nominal defendant Zillow is a Washington corporation with principal executive offices located at 1301 Second Avenue, Floor 36, Seattle, Washington. Zillow is a diversified, transaction-focused platform of connected solutions that help renters, buyers, sellers, and real estate professionals across all residential real estate needs. The Company's Zillow platform is the most visited real estate app and website in the United States, and connects consumers with real estate agents and loan officers as well as related digital solutions. Zillow is based on a living database of approximately 173 million U.S. homes and differentiated content, including the Company's patented proprietary automated valuation model to provide home value estimates, the Zestimate. As of December 31, 2025, the Company had 7,068 employees.

**Defendants**

18. Defendant Lloyd D. Frink ("Frink") has been Zillow's Co-Executive Chairman since August 2024; President since February 2005; and a director since December 2004. Defendant Frink was also Zillow's Executive Chair from February 2019 to August 2024; Vice Chairman from March 2011 to February 2019; Chief Strategy Officer from September 2010 to March 2011 and Vice President from December 2004 to February 2005. Defendant Frink co-founded Zillow in December 2004. While in possession of material, nonpublic information concerning Zillow's true business health, defendant Frink sold 375,090 shares of his stock for $ 31,205,542.12 in proceeds. Zillow paid defendant Frink the following compensation as an executive:

| Year | Salary | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2025 | $799,809 | $5,998,676 | $34,487 | $6,832,972 |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 5 -

Defendant Frink is a citizen of Washington.

19.     Defendant Richard N. Barton ("Barton") has been Zillow's Co-Executive Chairman since August 2024, and a director since December 2004.  Defendant Barton was also Zillow's Chief Executive Officer ("CEO") from February 2019 to August 2024, and also from December 2004 to September 2010; and Executive Chairman from September 2010 to February 2019.  Defendant Barton co-founded Zillow in December 2004.  While in possession of material, nonpublic information concerning Zillow's true business health, defendant Barton sold 350,000 shares of his stock for $29,835,795.97 in proceeds.  Zillow paid defendant Barton the following compensation as an executive:

| Year | Salary | Option Awards | All Other Compensation | Total |
|------|--------|---------------|------------------------|-------|
| 2025 | $821,889 | $5,998,676 | $32,397 | $6,852,962 |

Defendant Barton is a citizen of Washington.

20.     Defendant Jeremy Wacksman ("Wacksman") has been Zillow's CEO and a director since August 2024.  Defendant Wacksman was also Zillow's Chief Operating Officer from February 2021 to August 2024; President of Zillow from December 2019 to February 2021; President of Zillow Brand and Co-Head of Zillow Offers from June 2018 to December 2019; Chief Marketing Officer from July 2016 to June 2018; Chief Marketing Officer of Zillow August 2015 to July 2016; and Vice President of Marketing and Product Management from 2009 to August 2015.  Defendant Wacksman is named as a defendant in a related securities action that alleges he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  While in possession of material, nonpublic information concerning Zillow's true business health, defendant Wacksman sold 43,932 shares of his stock for $3,355,748.77 in proceeds.  Zillow paid defendant Wacksman the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | All Other Compensation | Total |
|------|--------|--------------|---------------|------------------------|-------|
| 2025 | $850,266 | $4,006,800 | $2,249,536 | $31,955 | $7,138,557 |

Defendant Wacksman is a citizen of Washington.

21.    Defendant Jeremy Hofmann ("Hofmann") has been Zillow's Chief Financial Officer ("CFO") since May 2023.  Defendant Hofmann was also Zillow's Senior Vice President, Corporate Development and Strategy from February 2022 to May 2023; Vice President, Corporate Development and Strategy from November 2018 to February 2022; and Senior Director, Corporate Development from October 2017 to November 2018.  Defendant Hofmann is named as a defendant in a related securities action that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  While in possession of material, nonpublic information concerning Zillow's true business health, defendant Hofmann sold 81,163 shares of his stock for $6,740,801.85 in proceeds.  Zillow paid defendant Hofmann the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2025 | $700,425 | $1,780,775 | $2,999,338 | $28,975 | $5,509,513 |

Defendant Hofmann is a citizen of Washington.

22.    Defendant Erik Blachford ("Blachford") has been a Zillow director since May 2005.  While in possession of material, nonpublic information concerning Zillow's true business health, defendant Blachford sold 4,309 shares of his stock for $323,425.12 in proceeds.  Zillow paid defendant Blachford the following compensation as a director:

| Fiscal Year | Restricted Stock Unit Awards | Total |
|---|---|---|
| 2025 | $296,061 | $296,061 |

Defendant Blachford is a citizen of California.

23.    Defendant Gregory B. Maffei ("Maffei") has been a Zillow director since May 2005.  Defendant Maffei has been the Chair and a member of Zillow's Audit Committee since at least April 2024.  Zillow paid defendant Maffei the following compensation as a director:

| Fiscal Year | Option Awards | Total |
|---|---|---|
| 2025 | $547,299 | $547,299 |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 7 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

Defendant Maffei is a citizen of Colorado.

24.     Defendant Gordon Stephenson ("Stephenson") has been a Zillow director since May 2005. Defendant Stephenson has been a member of Zillow's Audit Committee since at least April 2024. While in possession of material, nonpublic information concerning Zillow's true business health, defendant Stephenson sold 16,835 shares of his stock for $1,267,890.91 in proceeds. Zillow paid defendant Stephenson the following compensation as a director:

| Fiscal Year | Option Awards | Total |
|---|---|---|
| 2025 | $547,299 | $547,299 |

Defendant Stephenson is a citizen of Washington.

25.     Defendant Jay C. Hoag ("Hoag") has been a Zillow director since October 2005. Defendant Hoag has been the Chairman of the Compensation Committee since at least 2024. Zillow paid defendant Hoag the following compensation as a director:

| Fiscal Year | Option Awards | Total |
|---|---|---|
| 2025 | $547,299 | $547,299 |

Defendant Hoag is a citizen of California.

26.     Defendant April Underwood ("Underwood") has been a Zillow director since February 2017. Defendant Underwood has been a member of the Compensation Committee since at least 2024. While in possession of material, nonpublic information concerning Zillow's true business health, defendant Underwood sold 4,216 shares of her stock for $377,486.25 in proceeds. Zillow paid defendant Underwood the following compensation as a director:

| Fiscal Year | Restricted Stock Unit Awards | Option Awards | Total |
|---|---|---|---|
| 2025 | $74,054 | $410,404 | $484,458 |

Defendant Underwood is a citizen of California.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 8 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

27.     Defendant Amy C. Bohutinsky ("Bohutinsky") has been a Zillow director since October 2018.  Defendant Bohutinsky was also Zillow's Chief Operating Officer from August 2015 to January 2019; Chief Marketing Officer from March 2011 to August 2015; Vice President of Marketing and Communications from September 2010 to March 2011; Vice President of Communications from August 2008 to September 2010; and Director of Communications from August 2005 to August 2008.  Defendant Bohutinsky has been a member of the Compensation Committee since at least 2024.  Zillow paid defendant Bohutinsky the following compensation as a director:

| Fiscal Year | Option Awards | Total |
|---|---|---|
| 2025 | $547,299 | $547,299 |

Defendant Bohutinsky is a citizen of Washington.

28.     Defendant Claire Cormier Thielke ("Thielke") has been a Zillow director since October 2020.  Defendant Thielke has been a member of Zillow's Audit Committee since at least April 2024.  While in possession of material, nonpublic information concerning Zillow's true business health, defendant Thielke sold 10,384 shares of her stock for $816,157.39 in proceeds.  Zillow paid defendant Thielke the following compensation as a director:

| Fiscal Year | Restricted Stock Unit Awards | Option Awards | Total |
|---|---|---|---|
| 2025 | $74,054 | $410,404 | $484,458 |

Defendant Thielke is a resident of Hong Kong.

29.     Defendant J. William Gurley ("Gurley") has been a Zillow director since January 2024.  Defendant Gurley was also a Zillow director from October 2005 to December 2015.  Zillow paid defendant Gurley the following compensation as a director:

| Fiscal Year | Option Awards | Total |
|---|---|---|
| 2025 | $547,299 | $547,299 |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 9 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

Defendant Gurley is a citizen of Texas.

30.     The defendants identified in ¶¶18-21 are referred to herein as the "Officer Defendants."   The defendants identified in ¶¶22-29 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶18-22, 24, 26, 28 are referred to herein as the "Insider Selling Defendants."  The defendants identified in ¶¶23, 24, 28 are referred to herein as the "Audit Committee Defendants."   The defendants identified in ¶¶25-27 are referred to herein as the "Compensation Committee Defendants."   Collectively, the defendants identified in ¶¶18-29 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

31.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Zillow and its shareholders fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage Zillow in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Zillow and not in furtherance of their personal interest or benefit.

32.     To discharge their duties, the officers and directors of Zillow were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Zillow were required to, among other things:

(a)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations, including antitrust laws and regulations, so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(b)     remain informed as to how Zillow conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 10 -

connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

33.    The Individual Defendants, because of their advisory, executive, managerial, and directorial positions of control and authority, were able to and did, directly or indirectly, exercise commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took part in, or substantially, assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and in furtherance of the wrongdoing.

34.    Additionally, the Individual Defendants are required to adhere to the Company's corporate governance materials.  Zillow's officers are required to follow the Code of Ethics for CEO, CFO, principal accounting officer and controller (or persons performing similar functions) to "promote":

• Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

• Full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "SEC") and other public communications made by the Company; and

• Compliance with governmental laws, rules and regulations applicable to the Company.

35.    Any persons that become aware of a suspected violation of this Code of Ethics are required to report the suspected violation to the Audit Committee.  The Audit Committee then has the power to monitor, investigate, make determinations and make recommendations to the Board.

36.    The Company also adopted a Code of Conduct.  The Code of Conduct applies to the "Company officers, board members and employees (each, a 'Company Person'), as well as representatives, consultants, contractors, vendors, suppliers, and agents (and their respective employees) in their dealings with or on behalf of the Company."  The Code of Conduct acknowledges

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 11 -
TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

that the Company's directors and officers are in possession of material nonpublic information and are prohibited from trading on the basis of that information.  Specifically, it states:

**Insider Trading**

Company Persons, as well as the Company's representatives, consultants, contractors, vendors, suppliers, and agents who, as a result of their relationship with the Company, are in possession of material non-public information about the Company or other companies, including the Company's suppliers and customers, are prohibited by law and Company policy from trading in securities of the Company or such other companies, as well as from communicating such information to others who might trade on the basis of that information. To assist with compliance with laws against insider trading, the Company has adopted a detailed Insider Trading Policy.

37.     Regarding public disclosures, the Code of Conduct states:

**Public Disclosures**

The Company files reports and other documents with regulatory authorities, which may include the United States Securities and Exchange Commission (SEC) and Nasdaq. The Company may make other public communications, such as issuing press releases. All information provided in the Company's public reports and communications must be complete, fair, accurate, timely and understandable, and must also comply with applicable laws, rules and regulations. Any person subject to this Code who is asked to provide information for the Company's public disclosures must use all reasonable efforts to provide complete, fair, accurate, timely and understandable information. If any person subject to this Code becomes aware of any information concerning: (a) material defects in the disclosures made by the Company in its public filings; (b) significant deficiencies in the design or operation of internal controls; (c) any violation of this Code that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls; or (d) any material violation of the law or this Code, such person should follow the guidelines described in the Reporting and Compliance Procedures section. In connection with its public communications, the Company is required to comply with Regulation FD (Fair Disclosure) under the federal securities laws. Regulation FD provides that when the Company discloses material, non-public information about it to securities market professionals or shareholders (where it is reasonably foreseeable that the shareholders will trade on the information), the Company must also disclose the information to the public. All Company Persons are required to read carefully and comply with the Company's Media and External Communications Policy.

38.     The Code of Conduct specifically talks about compliance with antitrust laws, stating:

**Compliance with Antitrust Laws**

Antitrust laws of the United States and other countries are designed to protect consumers and competitors against unfair business practices and to promote and preserve competition. Examples of antitrust violations include coordinating prices with a competitor (known as price fixing) or agreeing with a competitor to restrict the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 12 -

supply or type of products made available to customers. Violations of antitrust laws may result in severe penalties against the Company, its agents and Company Persons, including substantial fines and criminal penalties. Company Persons subject to this Code are expected to maintain basic familiarity with the antitrust principles applicable to their role with the Company and should consult the General Counsel with any questions concerning compliance with these laws.

39.    The Board also developed a Corporate Governance Guidelines (the "Guidelines"). The Guidelines describe the Board's role as follows:

> The Board oversees and reviews management activities and advises on long-term and strategic issues, all with a view to enhancing the long-term value of the Company for shareholders. Among its many activities, the Board oversees the Company's business affairs and integrity, performs an annual evaluation of the Company's Chief Executive Officer, oversees management succession planning, and assesses Company risks and strategies for risk mitigation.

**Breaches of Duties**

40.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Zillow, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

41.    The Individual Defendants breached their duty of loyalty and caused Zillow to incur substantial damage by allowing defendants to cause, or by themselves causing, the Company to: (i) enter into the anticompetitive agreements with Redfin; and (ii) make materially false and misleading statements.

42.    The Individual Defendants, because of their positions of control and authority as officers or directors of Zillow, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Zillow has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

43.    In addition to these duties, under its Charter in effect since March 8, 2022, the Audit

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 13 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

Committee Defendants, defendants Maffei, Stephenson, and Thielke, owed specific duties to Zillow to assist the Board in overseeing the financial reporting process, the Company's compliance with legal and regulatory requirements, and the Company's enterprise risk in general.  Moreover, the Audit Committee's Charter listed additional responsibilities of the Audit Committee, stating:

***Review Financial Statements and Financial Disclosure***

8. Prior to filing any periodic report with the SEC, meet with management and the independent auditor to review and discuss the annual audited financial statements (including the report of the independent auditor thereon) and quarterly unaudited financial statements, including in each case the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

9. Regularly review with the independent auditor any audit problems or difficulties and management's response, including any restriction on the scope of activities, access to required information, the adequacy of internal controls, adjustments noted or proposed by the independent auditor but not taken (as immaterial or otherwise) by management, communications between the audit team and the national office concerning auditing or accounting issues, and any management or internal control letters issued or proposed to be issued by the auditor.

10. If so determined by the Committee, based on its review and discussion of the audited financial statements with management and the independent auditor, its discussions with the independent auditor regarding the matters required to be discussed by statement on Auditing Standard 1301 ("Communications with Audit Committees"), as amended from time to time, and its discussions regarding the auditor's independence, recommend to the Board whether the audited financial statements be included in the Company's annual report on Form 10-K.

11. Review earnings press releases, including all quarterly earnings releases and ancillary documents, in advance of their dissemination. Discuss or review corporate policies with respect to financial information and earnings guidance provided to analysts and rating agencies.

*     *     *

***Enterprise Risk Management***

18. Review, and discuss with management policies with respect to risk assessment and risk management, including the process by which the Company undertakes risk assessment and management.

*     *     *

***Legal Matters***

26. Review legal and regulatory matters that may have a material impact on the financial statements and related Company compliance policies and programs.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 14 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

44. While the Audit Committee Defendants had clear responsibilities with respect to ensuring that there were controls regarding the accuracy of the Company's financial disclosures and the Company's communication with the public, the Audit Committee Defendants failed to fulfill these responsibilities.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

45. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted or assisted each other in breaching their respective duties.

46. During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including shareholders of Zillow, regarding the Individual Defendants' management of Zillow's operations, including the Company's growth prospects and revenue projections; (ii) permit and facilitate the improper conduct that caused the anticompetitive Agreements; (iii) facilitate the Insider Selling Defendants' illicit sale of almost $74 million of their personally held shares while in possession of material nonpublic information; and (iv) enhance the Individual Defendants' executive and directorial positions at Zillow and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

47. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty and unjust enrichment; and to conceal adverse information concerning the Company's anticompetitive efforts.

48. The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company to purposefully or recklessly issue materially

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

- 15 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

false and misleading statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

49.  Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## ZILLOW AND REDFIN COMPETE IN THE ILS MARKET

50.  Zillow is an online real estate marketplace that helps people buy, sell, rent, and finance homes.  The Company classifies its revenue into four categories: residential, mortgages, rentals, and other.  Zillow explains it earns its revenues in its "rentals" segment by:

> [A]dvertising and a suite of tools sold to property managers on a cost per lead, lease, listing or impression basis or for a fixed fee for certain advertising packages through both the Zillow and StreetEasy brands. Rentals revenue also includes revenue generated from our rental applications product, through which potential renters can submit applications to multiple properties for a flat service fee.

51.  In 2025, Zillow's Rentals segment had 2.4 million average monthly active rental listings.  The Company's 2025 revenue from Rentals was $630 million, accounting for 24% of its total revenues for 2025.

52.  An ILS is an online directory or search database that aggregates property listings.  The widespread acceptance of the internet facilitated the adoption of ILS.  ILS largely replaced the traditional method of advertising housing rentals, local newspapers and classified listings.  Rental ILS are now the primary marketing channel that property management companies, landlords, and other types of property managers use to advertise places for rent.

53.  Zillow claims to be the most visited and searched ILS rental network.  In May 2024, the Company estimated that it had more than 50% of all rental listings.  Zillow and CoStar Group, Inc. ("CoStar") now account for the vast majority of ILS listings.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 16 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

54. In 2021, Redfin acquired RentPath. Redfin aggressively competed in the ILS rental market since then. In a 2024 earnings call, Redfin CEO Glenn Kelman ("Kelman") explained where Redfin fits into the consolidated rental ILS market: "the big players are getting bigger, and the small players are getting smaller, and [Redfin wants] to get on the right side of that.... Zillow and CoStar have been trying to grab more customers at the expense of some of the smaller players.... We're glad to keep growing."

55. As of May 2024, Redfin's strategy looked like a success. Kelman in May 2024 stated, "It's amazing that [Redfin] went from losing $10 million in [the rental segment] a year ago in Q1 to making money for the third straight quarter now. But the next stage in the Rent acquisition is to try to grab share, handover [sic] fist and really to grow the online marketplace."

## ZILLOW ENTERS INTO THE ANTICOMPETIVE AGREEMENT WITH REDFIN

56. Because Zillow operates throughout the United States, it is subject to both state and federal antitrust laws. This includes the Sherman Antitrust Act, 15 U.S.C. §§ 1-7 (the "Sherman Act," outlawing monopolistic business practices); the Federal Trade Commission Act, 15 U.S.C. §§ 41-58 (the "FTC Act," establishing the FTC and empowering it to investigate violations of the Sherman Act, seek monetary penalties, and prohibit unfair and deceptive acts or practices in commerce); and the Clayton Antitrust Act, 15 U.S.C. §§ 12-27 (the "Clayton Act," expanding the scope of the Sherman Act's prohibition on anticompetitive activities).

57. Section 1 of the Sherman Act makes illegal every contract, combination, or conspiracy in restraint of trade or commerce among the several States or with foreign nations. The Sherman Act prohibits agreements that unreasonably restrict competition, with violations punishable by fines and imprisonment.

58. Section 5 of the FTC Act declares "unfair methods of competition" and "unfair or deceptive acts or practices in or affecting commerce" unlawful. This law grants the FTC the authority to investigate and prohibit a wide range of anticompetitive and fraudulent business conduct, which

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 17 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

can include violations of antitrust laws and other activities that harm consumers or competition. The FTC uses section 5 to enforce rules related to competition, consumer protection, privacy, and security.

59. Section 7 of the Clayton Act prohibits mergers and acquisitions that "may be substantially to lessen competition, or to tend to create a monopoly." Enacted in 1914 and amended in 1950, this law is a cornerstone of U.S. antitrust law, primarily used to challenge potentially anticompetitive corporate transactions, and is enforced by agencies like the FTC and U.S. Department of Justice.

60. Zillow is also required to adhere to federal guidelines regarding mergers and holds a large market share in the ILS industry. The 2023 U.S. Department of Justice and FTC Merger Guidelines ("Merger Guidelines") employ a metric known as the Herfindahl-Hirschman Index ("HHI") to assess market concentration. The Merger Guidelines explain that markets with an HHI over 1,800 are considered highly concentrated, and a change in market concentration of more than 100 points is considered a significant increase. At these levels, acquisitions are presumed to substantially lessen competition.

61. Seeing the impending competition from Redfin, on February 6, 2025, Zillow and Redfin entered into the Partnership and Content License Agreements. Pursuant to the Partnership Agreement, in exchange for receiving $100 million from Zillow, Redfin agreed to facilitate the transition of the bulk of its multifamily rental advertising business to Zillow and shut down the remainder. The Partnership Agreement required Redfin to terminate all of its advertising contracts with managers of multifamily rental properties of twenty-five units or greater.

62. Specifically, in relevant part:

(a) ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████



(b)

(c)

(d)

(e)

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 19 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

63.    Pursuant to the Content License Agreement, Redfin has agreed to stay out of the market for up to nine years and to use its network to show only rental listings that are also displayed on Zillow's platform.  Specifically, the Content License Agreement states:

(a)



(b)

(c)

64.     Transition mechanics were designed to hand Redfin's book of business to Zillow quickly and comprehensively.  Redfin was required to use its "reasonable best efforts" to introduce Zillow's sales representatives to each multifamily advertising customer, provide prompt updates on all customer communications, and maintain adequate sales operations during the handoff so that customer relationships did not lapse before Zillow could contract them, thereby ensuring continuity while the business shifted to Zillow.  To enable immediate conversion of accounts, Redfin turned over competitively sensitive information—including detailed customer and contract information—to Zillow, which was expressly intended to make it easier for Zillow to capture Redfin's customers under Zillow's contracts.  Redfin also sent direct communications to its multifamily advertisers to facilitate the switch, and within months Zillow had signed contracts covering a substantial portion of properties that had been previously listed on Redfin but not on Zillow, evidencing the scale of the transfer.

65.     Workforce terms reinforced the handoff of commercial know-how and relationships.  Redfin terminated approximately 450 employees associated with its ILS rentals advertising business and provided Zillow with information about those personnel, which Zillow then used to selectively hire former Redfin sales people and support staff, preserving key property management company relationships and accelerating account migration under Zillow's platform.  Redfin also provided additional internal operational and marketing information to aid the transition of active pipelines and processes, further integrating execution capabilities into Zillow's organization.

66.     By June 15, 2025, Redfin deactivated multifamily listings for customers that did not sign with Zillow and sunset its Digital Marketing Solutions ("DMS")—including social-media management and search-term optimization tools—removing complementary marketing products that had supported Redfin's rentals ads and signaling the complete cessation of Redfin's standalone ILS advertising operations in multifamily.  The cumulative effect was to transform Redfin from an independent, growing competitor into a site hosting syndicated copies of Zillow's listings for multifamily, with Redfin's former ad-sales function, customer relationships, and related personnel repositioned around Zillow's marketplace structure.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 21 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

67.    In a Quarterly Report on Form 10-Q for the quarter ending March 31, 2025, Zillow reported a $100 million payment to Redfin under "intangible Assets", the label "Customer relationships."

68.    The Agreements are obviously anticompetitive.  The deal terms sit within an already highly concentrated ILS advertising landscape in which Zillow, Redfin, and CoStar were the clear leaders by traffic and revenue, and the arrangement eliminates one of the limited nationwide alternatives that advertisers had used to reach renters at scale.  The described consequences include higher prices and worse terms or quality for advertisers, diminished differentiation across platforms because Redfin's rentals pages host Zillow's inventory, and reduced incentives for Redfin to invest in renter traffic and user experience given that its multifamily revenue in this segment shifts from selling ads to lead-based compensation from Zillow with a guaranteed first-year minimum.

69.    For current and former overlap customers—those who previously listed on both platforms—the consolidation can require more expensive tiers or network-wide placements to obtain comparable visibility within a more crowded, Zillow-syndicated environment on the very same websites where they once purchased distinct Redfin placements, reflecting a direct change in commercial leverage and configuration after the transition.  The overall market result is that competition on the merits between these two firms for multifamily ILS advertising customers is removed, and Redfin's distinctive product and DMS are withdrawn, leaving advertisers with fewer independent options and renters with less differentiated discovery experiences across large national portals.

70.    There are a variety of different market share metrics that are informative as to the competitive significance of ILS, including, but not limited to, revenue, traffic, and listings.  Using revenue, traffic, or listings, the relevant markets are highly concentrated.  The nationwide market for ILS advertising has an HHI well over 1,800 and thus is highly concentrated.  Smaller relevant geographic markets for ILS advertising are likely even more concentrated.  Likewise, the nationwide market for ILS multifamily advertising has an HHI well over 1,800 and thus is highly concentrated.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 22 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

Smaller relevant geographic markets for ILS multifamily advertising are likely even more concentrated.

71.     Insofar as the Partnership Agreement and Content License Agreement constitute an acquisition, that acquisition would result in a change in market concentration well over 100 points in all relevant markets.  Both the nationwide market for ILS advertising and the nationwide market for ILS multifamily advertising have HHIs well over 2,500, and the unlawful agreements will result in a change in market concentration well over 200 points in each relevant market.  Under any relevant metric, Zillow holds a large share of these highly concentrated markets and any deals that further concentrate these markets would likely garner regulatory intervention.

## THE AGREEMENTS LEAD TO LAWSUITS AGAINST ZILLOW

72.     The structure of the Agreements caught the attention of the FTC and several Attorneys General.  On September 30, 2025, the FTC filed a lawsuit in the U.S. District Court for the Eastern District of Virginia against Zillow and Redfin, alleging that the two companies entered into an unlawful agreement to suppress competition in the market for multifamily rental housing advertising (the "FTC Action").  The FTC states that in February 2025, Zillow paid Redfin $100 million and provided other compensation in exchange for Redfin's agreement to terminate its rental-advertising contracts, exit the multifamily property advertising market for up to nine years, and become an exclusive syndicator of Zillow's listings—essentially turning Redfin's rental pages into duplicates of Zillow's content.

73.     According to the FTC, the companies mischaracterized the arrangement as a "partnership," but the FTC revealed that this was a deliberate effort to eliminate Redfin as an independent rival and insulate Zillow from competition.  Redfin even laid off hundreds of employees following the agreements, while Zillow subsequently hired selected former Redfin workers, underscoring the anticompetitive nature of the deal.  Zillow violated both Section 1 of the Sherman Act, Section 5 of the FTC Act, and Section 7 of the Clayton Act, constituting an unlawful acquisition and agreement to restrain trade.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

- 23 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

74.    The FTC's complaint emphasizes that this deal harms property managers (who now face fewer advertising options and potentially higher prices) and renters (who may see reduced innovation and fewer choices when searching for apartments online).  It seeks to bar Zillow and Redfin from maintaining or enforcing the agreements, and contemplates potential divestitures or structural remedies to restore market competition.  The FTC's decision to bring the case was unanimous (3-0), and the FTC has stated that it worked closely with several state Attorneys General during its investigation.

75.    The FTC also gave statements regarding Zillow's unlaw conduct.  "Paying off a competitor to stop competing against you is a violation of federal antitrust laws," said Daniel Guarnera, Director of the FTC's Bureau of Competition.  Further stating "Zillow paid millions of dollars to eliminate Redfin as an independent competitor in an already concentrated advertising market—one that's critical for renters, property managers, and the health of the overall U.S. housing market.  The FTC will do our part to ensure that Americans who are looking for safe, affordable rentals receive all the benefits of robust competition between internet listing services like Zillow and Redfin."

76.    On October 1, 2025, the Attorneys General of the Commonwealth of Virginia, Arizona, Connecticut, New York, and Washington filed a lawsuit in the U.S. District Court for the Eastern District of Virginia against Zillow and Redfin, alleging that Zillow and Redfin entered into unlawful agreements to suppress competition in the market for multifamily rental housing advertising (the "AG Action", the AG Action and the FTC Action are referred to collectively as the "Antitrust Actions").  The AG Action, similar to the FTC Action, stated that Zillow and Redfin schemed to eliminate competition through several means, including a $100 million payment from Zillow to Redfin.  The AG Action further alleges that the "unlawful agreements" by Zillow and Redfin "will result in reduced choice, higher prices, and reduced quality for multifamily rental advertising customers and will provide no cognizable procompetitive benefits."  The Attorneys General brought claims for violating Section 1 of the Sherman Act and Section 7 of the Clayton Act.  Attorney General

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 24 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

Letitia James of New York commented on the lawsuit, stating: "Millions of New Yorkers rely on online apartment listings to find an affordable and safe place to live[.]"  Attorney General Letitia James further stated:

> Zillow's attempt to shut down its competition could drive up costs for advertisers and leave renters with fewer options when searching for a new apartment.  New Yorkers are already struggling with an unaffordable housing market, and I will fight to stop this illegal deal that could make it even harder to find a home.

## BOARD DOCUMENTS CONFIRM THAT THE BOARD KNEW THE AGREEMENTS WERE ANTICOMPETITIVE

77. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

78. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

79. ████████████████████████████

80. ████████████████████████████

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

81.

82.     As subsequently held by Senior Judge Trenga in the FTC Action, "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question have an anticompetitive effect on customers and markets[.]"  FTC Action, ECF No. 154 at n.4.

83.

84.

- 27 -                     TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

85. ███████████████████████████████████████████████

86. ███████████████████████████████████████████████

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

- 28 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480



87.

## DEFENDANTS MAKE A SERIES OF FALSE STATEMENTS
## CONCERNING ZILLOW'S ANTITRUST EXPOSURE

88.     On February 11, 2025, Zillow announced the Agreements.  In particular, Zillow and Redfin announced "a *partnership* making Zillow the exclusive provider of multifamily rental listings ... on Redfin and its sites[.]"  The Agreements, however, are not a partnership.  Each agreement includes the following language: "[n]either this Agreement nor the cooperation of the parties contemplated herein shall be deemed or construed to create any partnership, joint venture, employment or agency relationship[.]"  In addition, both Agreements state that the relationship between the defendants is only that of "independent contractors."

89.     Also on February 11, 2025, Zillow filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2024 (the "2024 Form 10-K").  The 2024 Form 10-K was signed

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

by defendants Wacksman, Hofmann, Barton, Frink, Blachford, Bohutinsky, Gurley, Hoag, Maffei, Stephenson, Thielke, and Underwood.

90.     The 2024 Form 10-K contained the following risk disclosure under the heading "[w]e are from time to time involved in, and have in the past or may in the future be subject to claims, suits, government investigations, and other proceedings that may result in adverse outcomes", stating in pertinent part:

> We are from time to time involved in, and have in the past or may in the future be subject to claims, suits, government investigations, enforcement actions and proceedings arising from our business, including actions with respect to intellectual property, privacy, consumer protection, information security, mortgage brokering, mortgage origination, real estate, real estate brokerage, environmental, data protection, ***antitrust***, the Real Estate Settlement Procedures Act of 1974 (RESPA), fair housing or fair lending, compliance with securities laws, or law enforcement matters, tax matters, labor and employment, and commercial claims, as well as actions involving content generated by our customers, shareholder derivative actions, purported class action lawsuits, and other matters.
>
> *        *        *
>
> Such claims, suits, government investigations, and proceedings are inherently uncertain, and their results cannot be predicted with certainty. Regardless of the outcome, any such legal proceedings can have an adverse impact on us because of legal costs, diversion of management and other personnel, and other factors. In addition, it is possible that a resolution of one or more such proceedings could result in reputational harm, liability, fines, penalties, or sanctions, as well as judgments, consent decrees, or orders preventing us from offering certain features, functionalities, products, or services, or requiring a change in our business practices, products or technologies, which could in the future materially and adversely affect our business, operating results and financial condition.

(Emphasis added).

91.     The 2024 Form 10-K contained the following discussion concerning the Company's dealings with Redfin, including the Agreements:

> On February 6, 2025, we entered into a partnership ("rentals partnership") with Redfin Corporation ("Redfin"), making Zillow the exclusive provider of multifamily rental listings (properties with 25 or more units) on Redfin and its sites, including Rent.com and ApartmentGuide.com (together, "Redfin Rental Network"). Redfin will facilitate Zillow's entry into advertising agreements with property management companies that currently provide rental listings on Redfin. Pursuant to this rentals partnership, Zillow

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 30 -

will make a $100 million upfront payment to Redfin and will pay Redfin for leads generated through the Redfin Rental Network for an initial period of five years with two optional two-year extensions, subject to the terms of the underlying agreements. We have not yet completed our evaluation of the impact this rentals partnership will have on our consolidated financial statements.

92.    As stated above, on September 30, 2025, the FTC filed its action.  Zillow, however, downplayed the allegations.  CNBC quotes a Zillow spokesperson stating the following in response to the FTC Action:

Our listing syndication with Redfin benefits both renters and property managers and has expanded renters' access to multifamily listings across multiple platforms[.] It is pro-competitive and pro-consumer by connecting property managers to more high-intent renters so they can fill their vacancies and more renters can get home. We remain confident in this partnership and the enhanced value it has delivered and will continue to deliver to consumers.

93.    The above statements were materially false and misleading.  In truth, the Agreements were not a "partnership" but instead an effort by Zillow to eliminate a competitor.  Further, Zillow faced significant legal and regulatory risk and heighted expenses from the Agreements and ensuing Antitrust Actions.

**THE TRUTH EMERGES**

94.    On February 10, 2026, the Company held an earnings conference call to discuss its fourth quarter of 2025 earnings.  During the call, defendant Hofmann admitted that the Company faced "elevated legal expenses" and that these expenses were causing a "200 basis points headwind to EBITDA margins in Q1."  In particular, defendant Hofmann stated:

Last, we have ongoing elevated legal expenses. Of note, we estimate year-over-year increases in legal expenses will result in approximately 200 basis points headwind to EBITDA margins in Q1.

*       *       *

[E]xpenses of $505 million were slightly above our outlook due to higher-than-expected legal expenses.

95.    On May 6, 2026, after the close of the market, Judge Trenga of the Eastern District of Virginia denied Zillow and Redfin's motion to dismiss the FTC Action.  The court's decision underscored the seriousness of the allegations against Zillow and showed the general market that

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 31 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

Zillow would have to continue facing "elevated" legal expenses as it continues to defend itself and eventually settle or pay a judgment in the Antitrust Actions.

96.    As the market absorbed this news over the following week, Zillow's Class A stock fell to just $37.86, on May 14, 2026, from a pre-disclosure per share price of $44.83. During this same time period, the Company's Class C stock fell from $44.53 to $37.37. Altogether, Zillow's market capitalization fell nearly $1.6 billion.

97.    The Company's Class A and C shares now trade at just approximately $32 per share, from a high of $86.76 per Class A share and $90.32 per Class C share. In total, the Company's lost two thirds of its market capitalization from its peak and is now just around $7 billion.

98.    On June 9, 2026, investors filed a securities class action against the Company and certain of the defendants in the Securities Class Action. The Company will incur even additional legal expenses as a result of the Securities Class Action.

## INSIDER SALES BY INSIDER SELLING DEFENDANTS

99.    Rather than providing the market with correct information, the Insider Selling Defendants, defendants Frink, Barton, Hofmann, Wacksman, Stephenson, Thielke, Blachford, and Underwood, used their knowledge of Zillow's material, nonpublic information to sell their personal holdings while the Company's stock was artificially inflated. As officers and directors of Zillow, these defendants were privy to material, nonpublic information about the Company's true business health.

100.    The Insider Selling Defendants sold nearly $74 million worth of stock at artificially inflated prices as detailed by the table below:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **FRINK** | 7/22/2025 | 52,866 | $80.25 | $4,242,364.34 |
| **Current President and Co-Executive Chairman of the Board** | 7/23/2025 | 15,475 | $80.60 | $1,247,334.52 |
| | 7/23/2025 | 11,659 | $81.24 | $947,145.68 |
| | 8/11/2025 | 623 | $80.72 | $50,287.13 |
| | 8/11/2025 | 48 | $81.23 | $3,899.04 |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 32 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

| | | | |
|---|---|---|---|
| | 8/12/2025 | 5,483 | $80.30 | $440,283.80 |
| | 8/12/2025 | 512 | $81.07 | $41,507.48 |
| | 8/13/2025 | 1,016 | $80.89 | $82,185.05 |
| | 8/13/2025 | 928 | $82.04 | $76,130.34 |
| | 8/13/2025 | 257 | $83.36 | $21,423.80 |
| | 8/13/2025 | 1,121 | $84.30 | $94,502.09 |
| | 8/13/2025 | 12 | $84.86 | $1,018.32 |
| | 8/14/2025 | 150,000 | $85.00 | $12,750,000.00 |
| | 8/14/2025 | 100,000 | $85.00 | $8,500,000.00 |
| | 8/27/2025 | 2,232 | $84.74 | $189,148.61 |
| | 8/27/2025 | 777 | $85.41 | $66,363.10 |
| | 8/27/2025 | 324 | $86.38 | $27,986.67 |
| | 8/28/2025 | 2,175 | $84.31 | $183,375.99 |
| | 8/28/2025 | 1,158 | $84.99 | $98,422.59 |
| | 8/29/2025 | 3,091 | $84.58 | $261,445.74 |
| | 8/29/2025 | 243 | $85.44 | $20,762.04 |
| | 9/10/2025 | 1,879 | $85.97 | $161,536.69 |
| | 9/10/2025 | 945 | $87.09 | $82,299.48 |
| | 9/10/2025 | 461 | $87.93 | $40,535.73 |
| | 9/10/2025 | 48 | $88.72 | $4,258.56 |
| | 9/11/2025 | 254 | $85.64 | $21,752.59 |
| | 9/11/2025 | 530 | $87.64 | $46,446.76 |
| | 9/11/2025 | 1,431 | $88.60 | $126,785.60 |
| | 9/11/2025 | 1,118 | $89.39 | $99,938.58 |
| | 9/12/2025 | 3,238 | $88.21 | $285,616.21 |
| | 9/12/2025 | 96 | $88.95 | $8,539.20 |
| | 9/22/2025 | 1,315 | $81.27 | $106,865.05 |
| | 9/22/2025 | 515 | $82.39 | $42,429.82 |
| | 9/22/2025 | 1,393 | $83.88 | $116,850.27 |
| | 9/22/2025 | 110 | $84.68 | $9,315.30 |
| | 9/23/2025 | 1,448 | $80.41 | $116,429.34 |
| | 9/23/2025 | 264 | $81.24 | $21,447.60 |
| | 9/24/2025 | 787 | $80.19 | $63,107.88 |
| | 2/9/2026 | 9,158 | $54.63 | $500,284.14 |
| | 2/9/2026 | 100 | $55.17 | $5,517.00 |
| | **Total:** | **375,090** | | **$31,205,542.12** |
| | | | | |
| **BARTON** | 8/14/2025 | 40,220 | $84.06 | $3,380,865.05 |
| **Current Co-Executive Chairman and Co-Founder** | 8/14/2025 | 146,111 | $85.10 | $12,434,732.82 |
| | 8/14/2025 | 13,669 | $85.49 | $1,168,595.62 |
| | 8/15/2025 | 77,431 | $85.53 | $6,622,712.15 |
| | 8/15/2025 | 22,569 | $85.93 | $1,939,460.24 |
| | 8/15/2025 | 50,000 | $85.79 | $4,289,430.00 |
| | **Total:** | **350,000** | | **$29,835,795.87** |
| | | | | |
| **HOFMANN** | 1/28/2025 | 1,612 | $84.98 | $136,987.76 |

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

- 33 -

| | | | | |
|---|---|---|---|---|
| Current Chief Financial Officer | 1/30/2025 | 23,388 | $84.98 | $1,987,512.24 |
| | 2/18/2025 | 7,171 | $79.97 | $573,464.87 |
| | 5/16/2025 | 7,859 | $68.97 | $542,057.24 |
| | 5/16/2025 | 100 | $69.47 | $6,947.49 |
| | 8/15/2025 | 8,168 | $85.35 | $697,138.80 |
| | 9/8/2025 | 25,000 | $89.99 | $2,249,840.00 |
| | 11/14/2025 | 7,865 | $69.53 | $546,853.45 |
| | Total: | 81,163 | | $6,740,801.85 |
| | | | | |
| WACKSMAN | 2/18/2025 | 8,707 | $80.45 | $700,503.40 |
| Current CEO and Director | 2/18/2025 | 2,111 | $81.11 | $171,231.02 |
| | 5/16/2025 | 10,878 | $68.98 | $750,347.04 |
| | 5/16/2025 | 106 | $69.47 | $7,364.34 |
| | 8/15/2025 | 6,678 | $85.58 | $571,477.20 |
| | 8/15/2025 | 4,597 | $85.95 | $395,091.92 |
| | 11/14/2025 | 10,855 | $69.99 | $759,733.85 |
| | Total: | 43,932 | | $3,355,748.77 |
| | | | | |
| STEPHENSON | 5/13/2025 | 10,000 | $70.69 | $706,883.00 |
| Current Director | 8/8/2025 | 6,835 | $82.08 | $561,007.91 |
| | Total: | 16,835 | | $1,267,890.91 |
| | | | | |
| THIELKE | 3/4/2025 | 1,413 | $73.11 | $103,304.43 |
| Current Director | 6/12/2025 | 241 | $70.45 | $16,978.45 |
| | 8/11/2025 | 8,247 | $79.86 | $658,577.38 |
| | 9/3/2025 | 242 | $81.91 | $19,822.22 |
| | 12/3/2025 | 241 | $72.51 | $17,474.91 |
| | Total: | 10,384 | | $816,157.39 |
| | | | | |
| UNDERWOOD | 8/7/2025 | 595 | $86.01 | $51,178.75 |
| Current Director | 9/8/2025 | 3,621 | $90.12 | $326,307.50 |
| | Total: | 4,216 | | $377,486.25 |
| | | | | |
| BLACHFORD | 3/3/2025 | 1,413 | $75.33 | $106,440.16 |
| Current Director | 6/9/2025 | 965 | $70.35 | $67,887.75 |
| | 9/3/2025 | 966 | $81.91 | $79,125.06 |
| | 12/3/2025 | 965 | $72.51 | $69,972.15 |
| | Total: | 4,309 | | $323,425.12 |
| | | | | |
| | Total: | 885,929 | | $73,922,848.28 |

101. Certain of the Insider Selling Defendants sales were particularly suspicious given the amount of their personal Zillow holdings that they sold. In particular, defendant Thielke sold 98% of

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 34 -

her Zillow stock, defendant Underwood sold 90% of her Zillow stock, defendant Hofmann sold 47% of his Zillow stock, defendant Wacksman sold 21% of his Zillow stock, and defendant Stephenson sold 20% of his Zillow stock.

## DAMAGES TO ZILLOW

102. As a result of the Individual Defendants' improprieties, Zillow disseminated improper, public statements concerning the Agreements and the legal exposure caused by these Agreements. These improper statements have devastated Zillow's credibility as reflected by the Company's $13 billion, or 66%, market capitalization loss.

103. Zillow's performance issues also damaged its reputation within the business community and in the capital markets. Zillow's ability to raise equity capital or debt on favorable terms in the future is now impaired. In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

104. Further, as a direct and proximate result of the Individual Defendants' actions, Zillow has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a) costs incurred from defending and paying any settlement or judgement in the Antitrust Actions.

(b) costs incurred from defending and paying any settlement or judgment in the Securities Class Action for violations of federal securities laws;

(c) costs incurred in connection with the Agreements, including the $100 million paid to Redfin; and

(d) costs incurred from compensation and benefits paid to the defendants who have breached their duties to Zillow.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

- 35 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

105.   Finally, Zillow is entitled to recoup the ill-gotten gains the Insider Selling Defendants achieved through their sale of their personally held Zillow stock based on material nonpublic information.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

106.   Plaintiff brings this action derivatively in the right and for the benefit of Zillow to redress injuries suffered, and to be suffered, by Zillow as a direct result of breaches of fiduciary duty and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Zillow is named as a nominal defendant solely in a derivative capacity.

107.   Plaintiff will adequately and fairly represent the interests of Zillow in enforcing and prosecuting its rights.

108.   Plaintiff was a shareholder of Zillow at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Zillow shareholder.

109.   The current Board of Zillow consists of the following eleven individuals: defendants Barton, Blachford, Bohutinsky, Frink, Gurley, Hoag, Maffei, Stephenson, Thielke, Underwood, and Wacksman.  Plaintiff had not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because the Members of the Board Face a Substantial Likelihood of Liability for Their Misconduct**

110.   Defendants Barton, Blachford, Bohutinsky, Frink, Gurley, Hoag, Maffei, Stephenson, Thielke, Underwood, and Wacksman face a substantially likelihood of liability of either expressly or tacitly approving the facially illegal Agreements.

111.   Defendants Barton, Blachford, Frink, Stephenson, Thielke, Underwood, and Wacksman are interested in this action because they sold a material amount of their personally held Zillow stock on the basis of material nonpublic information.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 36 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

112. As alleged detailed above, defendants Barton, Blachford, Bohutinsky, Frink, Gurley, Hoag, Maffei, Stephenson, Thielke, Underwood, and Wacksman made the false and misleading statements in the Company's 2024 Form 10-K.

113. During the relevant period, defendants Maffei, Stephenson, and Thielke served as members of the Audit Committee. Pursuant to the Audit Committee Charter, the members were, and are, responsible for reviewing the integrity of the Company's internal controls, reviewing legal and regulatory matters, and discussing with management the Company's programs to monitor compliance with laws, regulations, and internal policies and standards. Defendants Maffei, Stephenson, and Thielke breached these obligations, however, by permitting the illegal Agreements and the false statements detailed herein. Therefore, defendants Maffei, Stephenson, and Thielke face a substantial likelihood of liability, and any demand upon them is futile.

114. Further, defendant Blackford is not independent of defendant Barton. In particular, defendants Barton and Blackford are co-owners of a condominium.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

115. Plaintiff incorporated by reference and realleged each and every allegation contained above, as though fully set forth herein.

116. The Individual Defendants owed and owe Zillow fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Zillow the highest obligation of loyalty and care.

117. Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry, causing the Company to engage in the misconduct described herein.

118. The Individual Defendants had actual or constructive knowledge that the Company entered into illegal anticompetitive agreements with Redfin, issued materially false and misleading statements, and failed to correct the Company's public statements. The Individual Defendants either

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 37 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly, recklessly, and for the purpose and effect of artificially inflating the price of the Company's securities.

119.    The Individual Defendants failed to correct or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact described herein, rendering them personally liable to the Company for breaching their fiduciary duties.

120.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent its publicly reported financials.  These actions could not have been a good-faith exercise of prudent business judgment to protect and promote the Company's corporate assets.

121.    The Insider Selling Defendants breached their duties to the Company by utilizing Zillow's material nonpublic information for their own gain.

122.    The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants failed to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

123.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Zillow has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

124.    Plaintiff, on behalf of Zillow, has no adequate remedy at law.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 38 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

## COUNT II

### Against the Individual Defendants for Unjust Enrichment

125. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

126. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Zillow. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Zillow. In addition, the Insider Selling Defendants were unjustly enriched through their improper use of the Company's own material nonpublic information for their own advantage.

127. Plaintiff, as a shareholder and representative of Zillow, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

128. Plaintiff, on behalf of Zillow, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Zillow, demands judgment as follows:

A. Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties and unjust enrichment;

B. Directing Zillow to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Zillow and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following corporate governance policies:

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

- 39 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

1.      a provision to strengthen the Board's supervision of the Company's conduct with competitors, including a review of all agreements with companies in the same industry as Zillow for antitrust compliance;

2.      a proposal to strengthen the Company's controls over financial reporting;

3.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

4.      a provision to permit the shareholders of Zillow to nominate at least three candidates for election to the Board;

5.      a proposal to strengthen the Company's controls over risk management; and

6.      a proposal to strengthen Zillow' oversight of its disclosure procedures;

C.      Extraordinary equitable and injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Zillow has an effective remedy;

D.      Awarding to Zillow restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: July __, 2026

TOWNSEND LEGAL, PLLC

By: /s/ Roger M. Townsend
Roger M. Townsend, WSBA# 25525
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480
Facsimile: (206) 455-9555
E-mail: roger@townsendlegal.com

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 40 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

ROBBINS LLP
Brian J. Robbins*
Stephen J. Oddo*
Michael J. Nicoud*
Jacob W. Ogbozo*
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsllp.com
        soddo@robbinsllp.com
        mnicoud@robbinsllp.com
        jogbozo@robbinsllp.com

*Pro Hac Vice applications forthcoming

Attorneys for Plaintiff

1732693

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT

- 41 -

TOWNSEND LEGAL, PLLC
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480